# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| CHICAGOLAND CONSERVATIVE JEWISH HIGH SCHOOL FOUNDATION, | Case No. 11-19342 |
| Debtor. |  |

## FINAL STIPULATED ORDER (A) AUTHORIZING USE OF CASH COLLATERAL AND (B) GRANTING ADEQUATE PROTECTION TO INDENTURE TRUSTEE

THIS CAUSE came before the Court on May 24, 2011 upon the scheduled final hearing (the "*Final Hearing*") on the Motion of the Debtor for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection to Indenture Trustee and (C) Scheduling a Final Hearing [Docket No. 5] (the "*Motion*")[1]; the Court having previously entered an interim Stipulated Order (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection to Indenture Trustee and (C) Scheduling a Final Hearing on May 9, 2011 (the "*Interim Order*") [Docket No. 33]; and the Court having considered the record in these cases, including the Declaration of Larry Gerber, Treasurer, in Support of First Day Motions [Docket No. 8]; the Court having received into evidence the budget attached to the Motion as Exhibit B; the Court having heard the arguments, proffered testimony and presentations of counsel at the Final Hearing; any objections filed to the Motion having been overruled or resolved at or before the Final Hearing; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of this

---

[1]     All capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it

appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court

having determined that the relief requested in the Motion is in the best interests of the Debtor, its

estate, its creditors and other parties in interest; and it appearing that proper and adequate notice

of the Motion has been given and that no other or further notice is necessary; and after due

deliberation thereon; and good and sufficient cause appearing therefor;

THE DEBTOR AND THE INDENTURE TRUSTEE HEREBY STIPULATE, AND

THE COURT HEREBY FINDS, AS FOLLOWS[2]:

A.      On the Petition Date, the Debtor filed a petition for relief under Chapter 11 of the

Bankruptcy Code.

B.      Since the Petition Date, the Debtor has continued in the management and

operation of its businesses and properties as a debtor-in-possession pursuant to Bankruptcy Code

Sections 1107 and 1108.  No trustee or committee has been appointed in the Debtor's Chapter 11

case.

C.      The Debtor admits, stipulates, acknowledges and agrees that:

(1)     Pursuant to a Trust Indenture dated as of May 1, 2006 (the "*Trust Indenture*"), between the Village of Deerfield, Lake and Cook Counties, Illinois (the "*Issuer*") and Amalgamated Bank of Chicago, the original indenture trustee ("*Original Trustee*"), the Issuer issued its Educational Facility Revenue Bonds (Chicagoland Conservative Jewish High School Project), Series 2006 in the aggregate principal amount of $27,515,000.00 (the "*Bonds*"). The Bonds were issued as fully registered bonds in the denominations of $5,000 and any integral multiples thereof.  The Bonds mature, bear interest at the respective rates *per annum*, payable on May 1 and November 1 of each year, commencing on November 1, 2006.  Wells Fargo Bank, National Association has succeeded the Original Trustee as trustee under the Trust Indenture (the Original Trustee, so succeeded, the "*Indenture Trustee*").

---

[2]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate pursuant to Rule 7052 of the Bankruptcy Rules, made applicable to this proceeding pursuant to Rule 9014 of the Bankruptcy Rules.

-2-

(2)     As of the Petition Date, the outstanding principal amount of the Bonds is $27,515,000, plus accrued interest ("*Bond Debt*");

(3)     The proceeds of the Bonds were loaned by the Issuer to the Debtor, pursuant to a Loan Agreement dated as of May 1, 2006, between the Issuer and the Debtor (the "*Loan Agreement*"), to finance the construction of the Debtor's state of the art school facility (the "*Project*"). Proceeds were also used by the Issuer to pay a portion of the costs of issuing the Bonds, and to create a debt service reserve fund (the "*DSRF*") held by the Indenture Trustee as additional security for repayment of the Bonds and for other amounts due and owing by the Debtor under the Loan Agreement. The DSRF was initially funded in the amount of $1,968,675, an amount equal to the maximum annual debt service on the Bonds. The Indenture Trustee has a first priority security interest in the DSRF and is in possession of the DSRF. The DSRF currently holds approximately $585,000;

(4)     In addition to the DSRF, the Bonds are secured by a Promissory Note dated as of May 1, 2006, made by the Debtor in favor of the Issuer pursuant to the Loan Agreement (the "*Promissory Note*"), and a Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated as of May 1, 2006 (the "*Mortgage and Security Agreement*"), among the Debtor, the Indenture Trustee, and MB Financial Bank, NA, not individually but as collateral trustee under a Trust Agreement dated February 2, 2004 and known as Land Trust No. 3366. As part of the Bond financing, the Issuer assigned its rights under Loan Agreement and the Promissory Note to the Indenture Trustee;

(5)     Pursuant to the Mortgage and Security Agreement, the Debtor granted to the Indenture Trustee, for the benefit of the bondholders, a first lien mortgage on the Project (as defined in the Mortgage and Security Agreement, the "*Mortgage*"), and a first priority security interest in (i) all sums on deposit at any time for the benefit of the mortgagee (as more fully defined in the Mortgage and Security Agreement, the "*Deposits*"), (ii) the Debtor's, fixtures, equipment, and all other personal property, including, without limitation, goods, equipment, accounts, and general intangibles (as more fully defined in the Mortgage and Security Agreement, the "*Personal Property*"), and (iii) all replacements and substitutes of and for the Personal Property, and the proceeds thereof ((i), (ii) and (iii) collectively and as more fully described in the Mortgage and Security Agreement, the "*Collateral*", and together with the DSRF and the Mortgage, the "*Prepetition Collateral*")[3];

(6)     As of the Petition Date, the Debtor is indebted to the Indenture Trustee in the amount of the Bond Debt, costs, fees, reimbursement obligations, attorneys fees and expenses and other amounts (collectively, the "*Prepetition Obligations*");

(7)     As of the Petition Date, the Bond Financing Documents are each valid and enforceable against the Debtor, and the Debtor does not possess and agrees not to assert any claim (as such term is defined in Section 101(5) of the Bankruptcy Code), counterclaim, setoff or

---

[3]     The Bonds, the Trust Indenture, the Loan Agreement, the Promissory Note, and the Mortgage and Security Agreement are referred to collectively herein as the "*Bond Financing Documents*."

defense of any kind, nature or description which would in any way affect the validity, enforceability or non-avoidability of the Bond Financing Documents;

(8)     As of the Petition Date, the Prepetition Obligations constitute legal, valid and binding obligations of the Debtor, enforceable in accordance with the terms of the Bond Financing Documents (other than with respect to a stay of enforcement arising from Section 362 of the Bankruptcy Code); no offsets, defenses or counterclaims to any of the Prepetition Obligations exists; no portion of the Prepetition Obligations is subject to avoidance, recharacterization, disallowance, reduction or subordination pursuant to the Bankruptcy Code or non-bankruptcy law; and the Prepetition Obligations constitute allowable secured claims; and the Debtors do hereby and have irrevocably waived, discharged and released the Indenture Trustee, the Majority Bondholders, and its and their affiliates, attorneys, agents, officers, directors and employees, of any rights the Debtor may have to challenge or object to the Prepetition Obligations, to challenge or object to the security for the Prepetition Obligations, or to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or in any way related to, the Bond Financing Documents (provided, however, that the Debtor does not waive, discharge or release the Indenture Trustee or the Majority Bondholders from their respective agreements, covenants and obligations under the Plan Support Agreements and Term Sheet);

(9)     The Debtor has analyzed the Indenture Trustee's liens and security interests in the Prepetition Collateral.  The Indenture Trustee's liens and security interests are valid, enforceable and perfected (by filing financing statements, deeds of trust, mortgages and fixture filings and, where necessary, by possession of relevant instruments, certificates or other property), and are not subject to avoidance, recharacterization, disallowance, reduction or subordination pursuant to the Bankruptcy Code or non-bankruptcy law.  All of such financing statements, deeds of trust, mortgages and fixture filings were validly authorized by the Debtor or validly executed by authorized representatives of the debtor.  Pursuant to the Bond Financing Documents, the Indenture Trustee has a perfected first priority security interest in and liens on all of the Prepetition Collateral, including the Cash Collateral (including all amounts on deposit in the Debtor's banking, checking or other deposit accounts), and all proceeds of the Prepetition Collateral to secure the Prepetition Obligations.

The foregoing acknowledgments and stipulations shall be binding on the Debtor but not on any other party in interest in this Case, except as provided in Decretal Paragraph 22.

D.     The Debtor has requested that the Indenture Trustee consent to the Debtor's use of Cash Collateral, and the Indenture Trustee is willing to consent to the Debtor's use of Cash Collateral on the terms and conditions provided herein.  The Indenture Trustee is relying on the terms, conditions and protections provided herein in so consenting.

-4-

E.      The agreements and arrangements described in the Motion and authorized in this Order have been negotiated at arm's-length with all parties represented by counsel, are fair and reasonable under the circumstances, and are enforceable in accordance with their terms. The Debtor and the Indenture Trustee are acting in good faith with respect to the use of Cash Collateral as provided in this Order. The superpriority claims, security interests and liens and other protections granted to the Indenture Trustee pursuant to this Order will not be affected by any subsequent reversal, modification, vacatur or amendment of this Order or any other order, as provided in Section 364(e) of the Bankruptcy Code.

F.      In light of the Indenture Trustee's agreement to subordinate its liens and superpriority claims to the Carve-Out, the Indenture Trustee is entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply.

G.      The liens and security interests granted to the Indenture Trustee hereunder shall not prime or impair any validly perfected lien or security interest senior to the liens and security interests of the Indenture Trustee with respect to the Debtor's assets and properties as of the Petition Date (the "*Prior Senior Liens*"). The granting of the replacement liens and other agreements of the Debtor hereunder constitute adequate protection to the Indenture Trustee for the Debtor's use of Cash Collateral for purposes of this Order.

H.      Good cause has been shown for entry of this Order. Without use of Cash Collateral, the Debtor will not be able to fund its day-to-day operations, including payroll for its employees. Unless the Court authorizes the use of Cash Collateral, the Debtor will be unable to pay for the goods and services necessary to preserve and maximize the value of the Debtor's assets while it attempts to obtain confirmation of its Chapter 11 plan. Accordingly, this Order is

required to avoid immediate and irreparable harm to the Debtor's estate. Entry of this Order is in the best interests of the Debtor, its creditors, and the estate.

THE DEBTOR AND THE INDENTURE TRUSTEE HEREBY STIPULATE, AND THE COURT HEREBY ORDERS, AS FOLLOWS:

1.      The Motion is granted on a final basis in accordance with the terms and conditions of this Order.

2.      <u>Use of Cash Collateral</u>. Subject to the provisions of this Order, and so long as the Termination Date (as defined herein) has not occurred, the Debtor is authorized pursuant to Bankruptcy Code Sections 105, 361, 362 and 363, and Bankruptcy Rules 2002, 4001, 6003 and 9014 to use Cash Collateral. The Cash Collateral may only be used to fund the types and corresponding amounts of itemized expenditures contained in the budget attached hereto as <u>Exhibit A</u> (the "*Budget*"), <u>provided</u>, <u>however</u>, that the Debtor may use Cash Collateral in excess of the amount designated for a particular line-item so long as the percentage of deviation for all line-items during any semi-monthly period does not exceed ten percent (10%), in aggregate (the "*Variance*"). Any unused portion of the Variance will carry over to the following semi-monthly period.

3.      <u>Term</u>. The Debtor is expressly authorized to use Cash Collateral until the occurrence and continuation of a Termination Date (defined below) following an Event of Default (defined below).

4.      <u>Reporting</u>. Within five (5) business days after the end of each calendar month, the Debtor will submit to the Indenture Trustee a monthly report reflecting the Debtor's actual cash inflows and outflows for such month as compared against the Budget and the Variance of actual cash inflows and outflows from those set forth in the Budget.

DM_US 28599215-2.099749.0351

5.     Adequate Protection; Replacement Liens.  As security for and solely to the extent of any diminution in the value of the Indenture Trustee's Prepetition Collateral from and after the Petition Date, calculated in accordance with Bankruptcy Code Section 506(a) (a "*Diminution in Value*"), the Indenture Trustee is hereby granted replacement liens upon all assets and property of the Debtor and its estate of any kind or nature whatsoever, now existing or hereafter acquired, including, without limitation, the Prepetition Collateral (the "*Replacement Liens*"), but excluding all claims and causes of action, and the products and proceeds thereof, arising under or permitted by Sections 502(d), 506(c), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code and any other avoidance claims and causes of action arising under state or federal law; provided, however, that the Replacement Liens shall be subject and subordinate to (a) the Carve-Out (defined below) and (b) the Prior Senior Liens.  The Replacement Liens so granted (i) are in addition to all security interests, liens, and rights of setoff existing in favor of the Indenture Trustee on the Petition Date; and (ii) are and shall be valid, perfected, enforceable and effective as of the Petition Date without any further action of the Debtor or the Indenture Trustee and without the necessity of the execution, filing or recording of any financing statements, security agreements, mortgages, or other document,  or of obtaining control agreements over bank accounts.

6.     Adequate Protection; 507(b) Priority Claim.  The Indenture Trustee is hereby granted an administrative claim with a priority equivalent to a claim under Section 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, on a dollar-for-dollar basis for and solely to the extent of any Diminution in Value, which administrative claim shall, among other things, have priority over all other costs and expenses of the kind specified in, or ordered pursuant to, Sections 105, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113 and 1114 of the

DM_US 28599215-2.099749.0351

Bankruptcy (the "*Super-Priority Administrative Claim*"), except for expenditures constituting the Carve-Out.

    7.    <u>Adequate Protection; Fees and Expenses</u>.  The Debtor is hereby authorized and directed to pay the reasonable fees and expenses of Indenture Trustee's outside legal and financial advisors (the "*Indenture Trustee Professional Fees*") in accordance with the Bond Financing Documents, <u>provided</u>, <u>however</u>, that such Indenture Trustee Professional Fees shall be paid solely from the DSRF and the Indenture Trustee shall not otherwise seek reimbursement of the Indenture Trustee Professional Fees from the Debtor or its estate.  Notwithstanding the foregoing, and provided that neither the Indenture Trustee nor any of the Majority Bondholders has breached in a material manner any of their respective obligations, representations, warranties, or covenants under the Plan Support Agreements or the Term Sheet, the Indenture Trustee reserves the right to seek reimbursement of any unpaid Bondholder Professional Fees from the Estate (a) with the consent of the Company or (b) if the Plan is not confirmed as negotiated.  Notwithstanding the foregoing, the Indenture Trustee shall be permitted to seek reimbursement of its own internal fees and expenses as an administrative expense of the estate.

    8.    <u>Carve-Out</u>.  The Replacement Liens and the Super-Priority Administrative Claim granted to the Indenture Trustee in this Order shall be subject and subordinate to the following expenditures, which will be by payable and chargeable against the Cash Collateral (the "*Carve-Out*"):  (a) all fees required to be paid to the Clerk of the Bankruptcy Court or to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); (b) all budgeted operating expenses of the Debtor accrued prior to the occurrence of the Termination Date; (c) all allowed fees and expenses of the agents, representatives, and advisors employed by the Debtor pursuant to Sections 327 and 1103 of the Bankruptcy Code accrued prior to the occurrence of the Termination Date not in excess of

$100,000; and (d) all allowed fees and expenses of the agents, representatives, and advisors employed by any official committee of creditors pursuant to Sections 327 and 1103 of the Bankruptcy Code accrued prior to the occurrence of the Termination Date not in excess of $30,000. Notwithstanding anything to the contrary set forth herein, no Cash Collateral nor any portion of the Carve-Out may be used to prosecute actions, claims, demands or causes of action against the Indenture Trustee, or to object to or contest in any manner, or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the Indenture Trustee's liens and security interests against the Prepetition Collateral or the Replacement Lien, provided, however, that up to $10,000 of the $30,000 allocated to any official committee of creditors may be used by any such official committee to inquire into and investigate these matters.

9.    Events of Default. Each of the following shall constitute an event of default ("*Event of Default*") with respect to the Debtor's authorization to use Cash Collateral, unless otherwise waived in writing by the Indenture Trustee:

(a)    Entry of an order converting this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code;

(b)    Entry of an order dismissing this Chapter 11 case;

(c)    Entry of an order appointing or directing the election of a trustee under Section 1104 of the Bankruptcy Code or an examiner under Section 1106(b) for the Debtor;

(d)    Without the prior written consent of the Indenture Trustee, the entry of any order (or other judicial action which has the effect of) amending, reversing, supplementing, staying the effectiveness of, vacating, or otherwise modifying this Order;

(e)    The Debtor uses Cash Collateral for any purpose or in a manner other than as permitted in this Order and in the Budget or otherwise fails to comply with any term of this Order;

(f)    The entry of an order by the Bankruptcy Court authorizing relief from stay by any person (other than the Indenture Trustee) on or with respect to all or any portion of the Prepetition Collateral with a value in excess of $50,000;

DM_US 28599215-2.099749.0351

(g)     The entry of an order by the Bankruptcy Court, without the prior written consent of the Indenture Trustee, authorizing the Debtor to obtain post-petition financing that is either senior or *parri passu* to the Prepetition Obligations or which is entitled to priority administrative status which is equal or senior to that of the Indenture Trustee herein;

(h)     The occurrence of an unwaived "Termination Event" under the Plan Support Agreement and the Plan Voting Agreement, each dated as of April 29, 2011, by and among the Debtor, the Indenture Trustee, and the Majority Bondholders, copies of which are attached hereto as Exhibit B ("*Plan Support Agreements*");

(i)     The Debtor voluntarily or involuntarily dissolves or is dissolved, liquidates or is liquidated or ceases the operation of any material portion of its business;

(j)     Any objection is filed which causes the Court to revoke or modify in any substantial manner adverse to the Indenture Trustee the previously-entered order approving the Stay Relief Motion; or

(j)     The occurrence of the Termination Date.

10.     <u>Termination Date</u>.  All authority to use Cash Collateral (other than to pay administrative expenses already incurred and professional fees benefiting from the Carve Out) shall cease on the date ( the "*Termination Date*") that is the earliest to occur of: (a) subject to Decretal Paragraph 11 of this Order, the occurrence and continuation of an Event of Default; (b) October 1, 2011; or (c) the effective date of the Chapter 11 Plan described in the Plan Support Agreements.

11.     <u>Termination Notice</u>.  If an Event of Default exists and is continuing, the Indenture Trustee may submit notice of such Event of Default and its intention to terminate the Debtor's authorization to use Cash Collateral (a "*Termination Notice*") to each of (a) the Debtor, (b) counsel for the Debtor, (c) counsel for any official committee of creditors appointed in this case, and (d) the office of the Office of the United States Trustee (the "*Notice Parties*").  The Debtor's right to use the Cash Collateral shall automatically terminate on the seventh (7th) business day after the Notice Parties' receipt of the Termination Notice from the Indenture Trustee (the

-10-

"*Termination Date*"), subject to the Debtor's right to contest such Event of Default and/or termination by a timely filed motion in the Bankruptcy Court.

12.  <u>Sale of Prepetition Collateral</u>.  The Debtor shall not (a) sell, transfer, lease, encumber or otherwise dispose of any portion of the Pre-Petition Collateral, without the prior written consent of the Indenture Trustee (and no such consent shall be implied, from any other action, inaction or acquiescence by the Indenture Trustee, or an order of this Court), except (i) for any sale, transfer, lease, encumbrance or disposition in the ordinary course of business or (ii) as otherwise provided for in this Order and approved by the Court, or (b) assume, reject or assign any material lease without the consent of the Indenture Trustee, which consent will not be unreasonably withheld.

13.  <u>Proofs of Claim</u>.  The Debtor acknowledges and agrees that the Prepetition Obligations and the related liens, rights, priorities and protections granted to or in favor of the Indenture Trustee as set forth herein and in the Bond Financing Documents shall each constitute a proof of claim on behalf of the Indenture Trustee in this case.  The Indenture Trustee may, but is not required to file proofs of claim in this case or any successor case.

14.  <u>No Duty to Monitor Compliance</u>.   The Indenture Trustee and the Majority Bondholders may assume that the Debtors will comply with all terms and conditions of this Order and the Budget and shall not (a) be obligated to ensure or monitor the Debtor's compliance with any financial covenants, formulae or other terms and conditions of this Order or the Bond Financing Documents, (b) be obligated to pay (directly or indirectly from Cash Collateral or otherwise) any expenses incurred or authorized to be incurred pursuant to this Order or in connection with the operation of the Debtor's business, or (c) be obligated to ensure or monitor that Cash Collateral exists to pay such expenses.

15. <u>No Waiver.</u> The failure of the Indenture Trustee to seek relief or otherwise exercise its rights and remedies under this Order or the Bond Financing Documents, as applicable, shall not constitute a waiver of any of the rights of the Indenture Trustee's rights hereunder, thereunder or otherwise. Notwithstanding anything herein, and subject to the undertakings of the Indenture Trustee in the Plan Support Agreements and the Term Sheet, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the Indenture Trustee under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the Indenture Trustee to (a) request conversion of this Chapter 11 case to a case under Chapter 7, dismissal of this Chapter 11 case, or the appointment of a trustee or examiner in this Chapter 11 case, (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan of reorganization, or (c) exercise any of its rights, claims or privileges (whether legal, equitable or otherwise).

16. <u>No Third Party Rights.</u> Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holders or any direct, indirect or incidental beneficiary.

17. <u>Section 552(b).</u> In light of its agreement to subordinate its liens and superpriority claims to the Carve-Out, the Indenture Trustee shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Indenture Trustee with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

18. <u>Effect of Order.</u> This Order shall be effective upon its entry and not subject to any stay (notwithstanding anything to the contrary contained in the Bankruptcy Rules including Bankruptcy Rule 4001(a)(3)). The provisions of this Order and any actions taken pursuant

DM_US 28599215-2.099749.0351

Case 11-19342 Doc 77 Filed 05/24/11 Entered 05/24/11 14:21:45 Desc Main
Document Page 13 of 14

hereto, shall survive the entry of any order which may be entered (a) confirming any plan of reorganization; (b) dismissing this Chapter 11 case; (c) converting this Chapter 11 cases to any other Chapter under the Code; (d) withdrawing of the references of this Chapter 11 case from the Court; and (e) providing for abstention from handling or retaining of jurisdiction of this Chapter 11 case in the Court. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable retroactive to the Petition Date immediately upon execution hereof.

19. <u>Amendments and Waivers</u>. The Debtor and the Indenture Trustee may amend, modify, supplement or waive any provision of this Order in writing if such amendment, modification, supplement or waiver is not material, without any need to apply to, or receive further approval from, the Court. The Debtor shall provide notice of any such nonmaterial amendment, modification, supplement or waiver to counsel for any official committee of creditors appointed in this case and the office of the Office of the United States Trustee. Any material amendment, modification, supplement or waiver shall be in writing, signed by the Debtor and the Indenture Trustee, and approved by the Court on appropriate notice by the Debtor.

20. <u>Order Governs</u>. In the event of any inconsistency between the provisions of this Order and the Motion, the provisions of this Order shall govern.

21. <u>Investigation Period</u>. The extent, validity, perfection, and enforceability of the Indenture Trustee's liens and security interests in the Prepetition Collateral (including, without limitation, the DSRF) shall for all purposes be subject to the rights of any party in interest other than the Debtor and the Chicagoland Jewish High School Endowment Fund to commence an action pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure to challenge or

-13-

Case 11-19342 Doc 64-1 Filed 05/14/11 Entered 05/14/11 14:22:37 Desc Exhibit
A Page 14 of 14

invalidate such liens and security interests, provided, however, that, unless agreed to in writing by the Indenture Trustee or ordered by the Court for cause shown, if no such action is commenced on or before (a) the 75th day after the entry of the Interim Order (*i.e.*, May 9, 2011) or (b) the 60th day from the formation any official committee appointed in this case, the Indenture Trustee's liens and security interests shall be deemed (x) valid, binding, in full force and effect, (y) perfected and senior to any and all other liens upon and claims against the Pre-Petition Collateral, and (z) not subject to any defenses, avoidance, subordination, or recharacterization.

Dated: May 24, 2011

ENTER

_____
United States Bankruptcy Judge

-14-

**Chicagoland Jewish High School**
**Post Petition Projected Cash Flow**
**For the Period 5/3/2011 to 7/31/2011**

| | For the Two Week Period Ending: | | | | | | |
|---|---|---|---|---|---|---|---|
| | 5/15/2011 | 5/31/2011 | 6/15/2011 | 6/30/2011 | 7/15/2011 | 7/31/2011 | Total |
| **Cash Collections:** | | | | | | | |
| *Tuition:* | | | | | | | |
| 2010-11 FACTS - 15th | 2,815 | - | 1,265 | - | - | - | 4,080 |
| 2010-11 FACTS - 30th | - | 13,388 | - | 10,917 | - | 7,419 | 31,724 |
| 2011-12 FACTS - 15th | - | - | - | - | 14,000 | - | 14,000 |
| 2011-12 FACTS - 30th | - | - | - | - | - | 96,000 | 96,000 |
| Tuition Re-Enrollment & Non-FACTS Tuition Payments | 2,500 | 2,500 | 2,500 | 2,500 | 40,000 | 40,000 | 90,000 |
| *Anticipated donations Collected:* | | | | | | | |
| JFMC Qrtly Grant | - | | - | | 13,524 | - | 13,524 |
| Donations (assumed same as 2009-10) | 20,500 | 8,100 | 48,500 | 15,000 | 16,200 | 8,500 | 116,800 |
| Pledge Payments Expected | - | 14,300 | - | 42,157 | - | 50,000 | 106,457 |
| Grant From Endowment | | 50,000 | 125,000 | 125,000 | 100,000 | - | 400,000 |
| **Anticipated Receipts** | 25,815 | 88,288 | 177,265 | 195,574 | 183,724 | 201,919 | 872,585 |
| **Cash Expenditures:** | | | | | | | |
| *Payroll & Benefits:* | | | | | | | |
| Net Pay & PR Taxes | 96,500 | 96,500 | 96,500 | 96,500 | 62,500 | 62,500 | 511,000 |
| 403B Pmt | 7,500 | 7,500 | 7,500 | 7,500 | 1,500 | 1,500 | 33,000 |
| HSA & Flex Ben Pmt | 5,200 | 5,200 | 5,200 | 5,200 | 2,800 | 2,800 | 26,400 |
| Emp Health Insurance | 15,050 | - | 15,050 | - | 15,050 | - | 45,150 |
| Emp LTD & Life | 660 | - | 660 | - | 660 | - | 1,980 |
| **Anticipated PR & Benefits** | 124,910 | 109,200 | 124,910 | 109,200 | 82,510 | 66,800 | 617,530 |
| *Other Operating Expenses (Fixed):* | | | | | | | |
| Operating Lease - Exercise Equip | 325 | - | 325 | - | 325 | - | 975 |
| Operating Lease - Copiers | 1,452 | - | 1,452 | - | 1,452 | - | 4,356 |
| Flex Plan Admin Fee | - | 126 | - | 126 | - | 126 | 378 |
| Outside Payroll Processing Fee | 310 | 310 | 310 | 310 | 310 | 310 | 1,860 |
| Internet Service | 301 | - | 301 | - | 301 | - | 903 |
| Cleaning Service | 5,600 | - | 5,600 | - | 5,600 | - | 16,800 |
| Elev Maint (KONE) | 391 | - | 391 | - | 391 | - | 1,173 |
| Precision Control | - | - | - | - | 1,428 | - | 1,428 |
| Scavenger | 250 | - | 250 | - | 250 | - | 750 |
| Landscaping | 950 | | 950 | | 950 | | 2,850 |
| Fire & Security Systems | 245 | - | - | - | - | 245 | 490 |
| *All Other AP & Operating Exp - Avg* | | | | | | | |
| Professional Fees & Expenses | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 90,000 |
| Admin Expense - Filing & statutory Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Technology Consultant | | 5,000 | | 5,000 | 2,000 | | 12,000 |
| Utilities (gas, elec, water etc) | 12,600 | - | 12,600 | - | 10,125 | - | 35,325 |
| Bldg Maint & Other Occup Costs | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Miscellaneous Disbursements | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 15,000 |
| *Department Expenses - Variable:* | | | | | | | |
| Academic Programs | 1,000 | 4,300 | 1,400 | 100 | 12,650 | 250 | 19,700 |
| Athletics | - | 1,500 | 2,700 | 600 | 1,200 | 1,650 | 7,650 |
| Religious Life | - | 1,750 | - | 5,900 | - | | 7,650 |
| Faculty Recruit & Development | - | 510 | 200 | 975 | 1,200 | 600 | 3,485 |
| Business Office | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 8,700 |
| Admissions & Recruitment | - | - | 1,070 | - | - | - | 1,070 |
| Marketing | - | - | 625 | 925 | - | 500 | 2,050 |
| Development | - | 300 | 800 | 1,017 | 100 | 750 | 2,967 |
| Occupancy - R&M, Supplies | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 10,800 |
| All Other Dept AP | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 18,000 |
| **Anticipated Non-PR Expenditures** | 57,174 | 47,546 | 62,724 | 48,703 | 72,032 | 38,181 | 326,360 |
| **Anticipated Total Expenditures** | 182,084 | 156,746 | 187,634 | 157,903 | 154,542 | 104,981 | 943,890 |
| **Period Cash Overage (Shortage)** | (156,269) | (68,458) | (10,369) | 37,671 | 29,182 | 96,938 | (71,305) |
| Add: Beginning Cash Balance | 261,201 | 104,932 | 36,474 | 26,105 | 63,776 | 92,958 | 261,201 |
| **End Cash Balance** | 104,932 | 36,474 | 26,105 | 63,776 | 92,958 | 189,896 | 189,896 |

| Note: |
|---|
| Above does not indicate school exchange programs in which student event fees are collected for a particular event (Shabbotin'im, Luch Program certain athletic out of town tournaments) and from these fees the school will disburse the various costs associated with the event. These events are not part of the school's budget in that they are to be self funding. |

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (the "Agreement"), dated as of April 29, 2011, is made and entered into by and among (i) Chicagoland Conservative Jewish High School Foundation (the "Company"), (ii) Chicagoland Jewish High School Endowment Fund (the "Endowment Fund"); (iii) Invesco Van Kampen High Yield Municipal Fund, (iv) Invesco Van Kampen Municipal Trust, (v) Nuveen High Yield Municipal Bond Fund, (vi) Oppenheimer Rochester National Municipals, (vii) Pacific Specialty Insurance Company, (viii) Stonebridge Capital Advisors, LLC, (ix) Tailwind Advisors LLC, and (x) Wells Fargo Bank, National Association, not individually but as successor indenture trustee (the "Indenture Trustee"). (The parties listed in clauses (iii) through (ix) above shall be referred to, collectively, as the "Majority Bondholders." The Indenture Trustee and the Majority Bondholders are referred to, collectively, as the "Bondholder Parties." The Company, the Endowment Fund and the Bondholder Parties shall be referred to, collectively, as the "Parties.")

## RECITALS

WHEREAS, pursuant to that certain Trust Indenture dated as of May 1, 2006 (the "Trust Indenture"), by and between the Village of Deerfield, Lake and Cook Counties, Illinois (the "Issuer") and the Indenture Trustee, the Issuer issued those certain Educational Facility Revenue Bonds (Chicagoland Conservative Jewish High School Project), Series 2006 in the aggregate principal amount of $27,515,000 (the "Bonds");

WHEREAS, as of the date of the Agreement, the Majority Bondholders, along with Allstate Insurance Company, hold or control a majority of the Bonds in the following principal amounts:

| | |
|---|---|
| Tailwind Advisors LLC | $500,000 |
| Invesco Van Kampen High Yield Municipal Fund | $7,625,000 |
| Invesco Van Kampen Municipal Trust | $1,000,000 |
| Nuveen High Yield Municipal Bond Fund | $1,500,000 |
| Oppenheimer Rochester National Municipals | $1,500,000 |
| Pacific Specialty Insurance Company | $250,000 |
| Stonebridge Capital Advisors, LLC | $1,650,000 |
| TOTAL | $14,025,000 |

WHEREAS, the proceeds of the Bonds were loaned to the Company, a not-for-profit corporation duly organized and validly existing under the laws of the State of Illinois, pursuant to a certain Loan Agreement dated as of May 1, 2006, by and between the Issuer and the Company (the "Loan Agreement"), to finance the acquisition of land and the construction and equipping of the Company's high school facility located at 1095 Lake Cook Road in Deerfield, Illinois (the "Project"). The loan is evidenced by a certain Promissory Note dated as of May 1, 2006 (the "Note") made by the Debtor in favor of the Issuer, and assigned by the Issuer to the Indenture Trustee;

- 1 -

WHEREAS, as security for the Note and the Bonds, the Company granted to the Indenture Trustee, for the benefit of the Bondholders, a mortgage on the Project and a security interest in fixtures, equipment and all other personal property at the Project, as evidenced by a certain Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated as of May 1, 2006, by and between the Company and MB Financial Bank, NA, as trustee under Land Trust No. 3366 (the "Mortgage");

WHEREAS, the Company and the Bondholder Parties have agreed to implement a restructuring of the Bonds and a reorganization of the Company pursuant to the terms and conditions set forth in the restructuring term sheet attached hereto as **Exhibit A** (including the schedules and exhibits attached thereto, the "Plan Term Sheet"). The Plan Term Sheet is the product of arm's length, good faith negotiations between the Company, the Indenture Trustee, and the Majority Bondholders;

WHEREAS, it is agreed that the restructuring transactions contemplated by the Plan Term Sheet (the "Restructuring Transactions") will be implemented through a plan of reorganization under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), which plan shall be consistent in all material respects with the terms of the Plan Term Sheet and shall be substantially in the form of **Exhibit B** hereto (the "Plan"); and

WHEREAS, the Company has agreed to commence a voluntary reorganization case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court") to implement the Plan and effect the Restructuring Transactions.

## AGREEMENT

NOW THEREFORE, in consideration of the mutual promises and covenants set forth herein, and for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties covenant and agree as follows:

1.    **Additional Definitions.**  Capitalized terms used in this Agreement and not defined in this Agreement (including the Recitals) shall have the meanings given to those terms in the Plan Term sheet. Additionally, the following terms have the following meanings:

(a)    "Definitive Documents" means the documents implementing, achieving and relating to the Plan and the Plan Term Sheet, including appropriate "first day" motions, the order of the Bankruptcy Court confirming the Plan, the Amended and Restated Bond Documents, and definitive documentation relating to any use of cash collateral, charter, bylaws and other corporate or organizational documents, warrant related agreements, shareholder related agreements, or other related documents, which shall contain terms and conditions consistent in all respects with the Plan Term Sheet and shall otherwise be reasonably satisfactory in all respects to the Parties, in accordance with Section 9 hereof.

(b)    "Lock-Up Effective Date" means the date upon which this Agreement becomes effective and binding on the Parties in accordance with the provisions of Section 12 hereof.

- 2 -

(c)   "Lock-Up Period" means the period commencing on the Lock-Up Effective Date and ending on the date on which this Agreement is terminated in accordance with Section 7 hereof.

2.   **Agreements of the Majority Bondholders.**

(a)   Each Majority Bondholder represents and warrants that, as of the date hereof, (1) such Majority Bondholder is the beneficial owner of the aggregate principal amount of Bonds set forth in the Recital above and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such Bonds (the "Claims"), and (2) such Majority Bondholder has full power and authority to vote on and consent to all matters concerning such Bonds and the Claims and to exchange, assign and transfer such Bonds and Claims.

(b)   Each Majority Bondholder agrees that, unless and until this Agreement has been duly and properly terminated in accordance with Section 7 hereof, it:

(1)   shall timely vote or cause to be voted its Bonds and Claims to accept the Plan, provided, however, that such vote may, upon prior written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Majority Bondholder at any time following the expiration of the Lock-Up Period;

(2)   shall timely vote or cause to be voted against, and not consent to, or otherwise directly or indirectly support, solicit, assist, encourage or participate in the formulation of, any plan, proposal, or offer of restructuring, reorganization, dissolution, winding up, liquidation, or merger of the Company other than the Plan Term Sheet and the Plan; and

(3)   if Section 4(g) of this Agreement applies and the Company complies with its obligations under Section 4(g), shall not oppose the Permitted Cram-Down (as defined in Section 4(g) hereof).

(c)   Each Majority Bondholder agrees that until this Agreement has been duly and properly terminated in accordance with Section 7 hereof, it shall not (1) directly or indirectly seek, solicit, support or encourage the termination or modification of the exclusive period for the filing of any plan, proposal or offer of restructuring, reorganization, dissolution, winding up, liquidation, or merger of the Company, or take any other action (including, without limitation, commencing any legal proceedings or enforcing rights, liens, or security interests) that could materially prevent, interfere with, delay, or impede the approval or confirmation of the Plan (the "Solicitation") or the implementation or consummation of the Restructuring Transactions as contemplated by the Plan Term Sheet and the Plan, (2) take any other action that is inconsistent with, that would materially delay confirmation or consummation of the Plan Term Sheet, the Plan, or the Restructuring Transactions, or (3) if Section 4(g) of this Agreement applies, take any action inconsistent with (b)(3) above; provided, however, that nothing contained herein shall limit the rights of a Majority Bondholder from appearing and participating in the Chapter 11 Case as a party-in-interest concerning any matter arising in the Chapter 11 Case so long as the

- 3 -

exercise of such rights is not inconsistent with such Majority Bondholder's obligations hereunder and the terms of the Plan Term Sheet and the Plan.

(d)     Each Majority Bondholder agrees that, for the duration of the Lock-Up Period, such Majority Bondholder shall not sell, transfer, loan, hypothecate, assign, or otherwise dispose of (including by participation), in whole or in part, any of the Bonds or any option thereon or any right or interest therein (including the deposit of any Bonds into a voting trust or entry into a voting agreement with respect to any such Bonds), unless the transferee thereof either (1) is a Majority Bondholder or (2) prior to such transfer, agrees in writing for the benefit of the Parties to be bound by all of the terms of this Agreement applicable to Majority Bondholders by executing the Joinder Agreement attached hereto as **Exhibit C** (the "Joinder Agreement") and delivering an executed copy thereof to the Company's counsel, in which event the transferee shall be deemed to be a Majority Bondholder hereunder to the extent of such transferred rights and obligations. Each Majority Bondholder agrees that any sale, transfer or assignment of any Bonds that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Party shall have the right to enforce the voiding of such transfer.

(e)     To the extent any Bondholder Party (1) acquires additional Bonds or (2) holds or acquires any other claims, rights or interests against the Company entitled to vote on the Plan, then, in each case, such Bondholder Party agrees that such claims, rights or interests shall be subject to this Agreement (including, without limitation, Section 2(c) hereof) and that, for the duration of the Lock-Up Period, it shall vote (or cause to be voted) any such claims, rights or interests in a manner consistent with Section 2(b) hereof. Each Bondholder Party agrees that, for the duration of the Lock-Up Period, it shall vote any and all of its other claims, rights or interests in the Company in a manner consistent with Section 2(b) hereof, and shall not transfer any such claims.

3.     **Agreements of the Indenture Trustee.**

(a)     The Indenture Trustee agrees that until this Agreement has been duly and properly terminated in accordance with Section 7 hereof, it shall not (1) directly or indirectly seek, solicit, support or encourage the termination or modification of the exclusive period for the filing of any plan, proposal or offer of restructuring, reorganization, dissolution, winding up, liquidation, or merger of the Company, or take any other action (including, without limitation, commencing any legal proceedings or enforcing rights, liens, or security interests) that could materially prevent, interfere with, delay, or impede the Solicitation or confirmation of the Plan or the implementation or consummation of the Restructuring Transactions as contemplated by the Plan Term Sheet and the Plan, or (2) take any other action that is inconsistent with, or that would materially delay confirmation or consummation of the Plan Term Sheet, the Plan, or the Restructuring Transactions, provided, however, that nothing contained herein shall limit the rights of the Indenture Trustee from appearing and participating in the Chapter 11 Case as a party-in-interest concerning any matter arising in the Chapter 11 Case so long as the exercise of such rights is not inconsistent with the Indenture Trustee's obligations hereunder and the terms of the Plan Term Sheet and the Plan.

- 4 -

(b)   The Indenture Trustee agrees that it will permit the Disclosure Statement to state that the Indenture Trustee believes that the Plan, as contemplated by the Plan Term Sheet, is fair to all holders of the Bonds.

(c)   The Indenture Trustee agrees that, following confirmation of the Plan and on or before the Plan Effective Date, it will contribute to the Company, solely from the DSRF, funds in the amount of $550,000 for purposes of funding the New Series A DSRF (as defined in the Plan Term Sheet) in order to consummate the Plan and the Restructuring Transactions in accordance with the Plan Term Sheet on or prior to the Plan Effective Date; provided, however, that the failure of the Indenture to remit any portion of the $550,000 will result solely in both the Initial DSRF Requirement and the Subsequent DSRF Requirement being reduced by difference between $550,000 and the amount actually remitted.

4.   <u>Agreements of the Company</u>.  The Company hereby agrees that it shall:

(a)   use its best efforts to (1) commence the Chapter 11 Case (such date, the "<u>Filing Date</u>") no later than May 6, 2011, and, consistent with the Plan Term Sheet, file a "first day" motions for the use of cash collateral in substantially the form attached as **Exhibit D** ("<u>Cash Collateral Motion</u>") and to lift the stay respecting the Indenture Trustee's use of the DSRF in substantially the form attached as **Exhibit E** (the "<u>Stay Relief Motion</u>"); (2) obtain a final order approving the Cash Collateral Motion and, if required by the Bankruptcy Court, the Stay Relief Motion, each within forty-five (45) calendar days of the Filing Date; (3) file the Plan and an accompanying disclosure statement (the "<u>Disclosure Statement</u>") with the Bankruptcy Court within twenty (20) calendar days of the Filing Date; (4) obtain an order or orders from the Bankruptcy Court approving the Disclosure Statement and confirming the Plan within one hundred (100) calendar days of the Filing Date (the "<u>Plan Confirmation Date</u>"); and (5) consummate the Plan and the Restructuring Transactions on or prior to October 1, 2011 (the "<u>Plan Effective Date</u>");

(b)   prepare or cause the preparation, as soon as practicable after the date hereof and prior to the Filing Date, of each of the Plan, the Disclosure Statement and the other Definitive Documents, each containing terms and conditions materially consistent with the Plan Term Sheet, and to distribute such documents and afford reasonable opportunity of comment and review to the respective legal and financial advisors for the Bondholder Parties in advance of any filing thereof;

(c)   except as provided in (g) below, not (1) directly or indirectly seek, solicit, support or encourage the formulation, preparation, filing or prosecution of any plan (other than the Plan), proposal, or offer of restructuring, reorganization, dissolution, winding up, liquidation, or merger of the Company, (2) take any other action that could prevent, interfere with, delay or impede the approval of the Disclosure Statement, the confirmation of the Plan, or the implementation or consummation of the Restructuring Transactions as contemplated by the Plan Term Sheet and the Plan, or (3) take any other action that is inconsistent with, or that would materially delay confirmation or consummation of the Plan or the Restructuring Transactions;

(d)   provide to the Bondholder Parties (1) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to

DM_US 27229258-16.099749.0351

the Company's books, records, and facilities and (2) reasonable access to the respective management and advisors of the Company for the purposes of participating in the planning process with respect to the Restructuring Transactions;

      (e)    use reasonable efforts to support (and not directly or indirectly oppose) a motion or other efforts by the Bondholder Parties to seek the formation of, and their appointment to, an official bondholders' committee in the Chapter 11 Case;

      (f)    negotiate and pay prior to the Filing Date a retainer to Greenberg Traurig, LLP as bond and tax counsel to the Village of Deerfield in connection with the Restructuring Transactions; and

      (g)    in the event that the owners of the Claims in Class 4 of the Plan fail to accept the Plan in amounts sufficient to satisfy section 1126(c) of the Bankruptcy Code, the Company shall take all reasonable steps necessary to confirm the Plan and to seek confirmation of the treatment afforded to Class 4 under the Plan pursuant to section 1129(b) of the Bankruptcy Code (the "Permitted Cram-Down") on or before the Plan Confirmation Date.

     5.    **Agreements of the Endowment Fund**.  The Endowment Fund agrees that it shall:

      (a)    prepare or cause the preparation, as soon as practicable after the date hereof and prior to the Filing Date, of each of the Definitive Documents applicable to it, each containing terms and conditions materially consistent with the Plan Term Sheet, and to distribute such documents and afford reasonable opportunity of comment and review to the respective legal and financial advisors for the Bondholder Parties in advance of any filing thereof;

      (b)    not (1) directly or indirectly seek, solicit, support or encourage the formulation, preparation, filing or prosecution of any plan (other than the Plan), proposal, or offer of restructuring, reorganization, dissolution, winding up, liquidation, or merger of the Company, (2) take any other action that could prevent, interfere with, delay or impede the approval of the Disclosure Statement, the confirmation of the Plan, or the implementation or consummation of the Restructuring Transactions as contemplated by the Plan Term Sheet and the Plan, or (3) take any other action that is inconsistent with, or that would materially delay confirmation or consummation of the Plan or the Restructuring Transactions;

      (c)    commencing on the Filing Date, advance funds to the Company as contributions, not as loans or other evidences of indebtedness, to the extent the Company does not have adequate resources therefor (1) all ordinary and necessary expenses of the Company in order for the Company to continue its business in the ordinary course as a debtor-in-possession in the Chapter 11 Case, and (2) all costs incurred by the Company to comply with the bankruptcy laws during the Chapter 11 Case; and

      (d)    following confirmation of the Plan and on or before the Plan Effective Date (1) execute and deliver the Security Agreement in the form attached hereto as **Exhibit F** ("Endowment Fund Security Agreement"); (2) contribute to the Company funds in the amount required to consummate the Plan and the Restructuring Transactions in accordance with the Plan

Term Sheet on or prior to the Plan Effective Date; and (3) submit to the jurisdiction of the Bankruptcy Court as part of the confirmation order of the Bankruptcy Court respecting the Plan.

6. **Agreements Regarding Bondholder Party Fees and Expenses**.

(a)    The Bondholder Professional Fees shall be paid solely from the DSRF and each of the Majority Bondholders and the Indenture Trustee shall not otherwise seek reimbursement of the Bondholder Professional Fees from the Debtor or its bankruptcy estate (the "Estate"). Notwithstanding the foregoing, and provided that none of the Bondholder Parties has breached in a material manner any of its obligations, representations, warranties, or covenants under the Term Sheet or this Plan Support Agreement, each of the Majority Bondholders and the Indenture Trustee reserves the right to seek reimbursement of any unpaid Bondholder Professional Fees from the Estate (i) with the written consent of the Company, (ii) if the Plan is not confirmed as provided in the Term Sheet, or (iii) if this Plan Support Agreement has been duly and properly terminated in accordance with Section 7(a) hereof. For the avoidance of doubt, the Indenture Trustee shall be entitled to seek, and the Company will consent and pay for the, reimbursement of the Indenture Trustee's own reasonable internal fees and expenses as an administrative expense of the Estate.

(b)    Provided that the Plan is consummated in accordance with this Agreement and the Plan Term Sheet, each of the Majority Bondholders and the Indenture Trustee agrees to waive, as of the Plan Effective Date, any and all obligations of the Company under any existing agreements of the Company regarding the payment of the fees and expenses of the Majority Bondholders and the Indenture Trustee and their advisors incurred prior to the Filing Date.

7. **Termination of Agreement**.

(a)    Termination by Majority Bondholders. If any of the following events (each, a "Termination Event") occurs, is continuing, and is not waived in accordance with Section 11 hereof, the Majority Bondholders may submit notice of such Termination Event and its intention to terminate this Agreement ("Termination Notice") to the Company and counsel for the Company:

(i)    the Company files, propounds or otherwise supports any plan of reorganization or restructuring other than the Plan and in accordance with the Plan Term Sheet;

(ii)    the Plan is not filed or is modified or replaced such that it (or any such replacement) at any time is not in whole or in part consistent in any material respect with the Plan Term Sheet;

(iii)    the Company withdraws or revokes the Plan Term Sheet or the Plan;

(iv)    the Company shall have breached in a material manner any of its obligations, representations, warranties, or covenants under this Agreement, and shall have failed to cure such breach within a reasonable period of time;

- 7 -

(v)   any final Definitive Documents, including any modification or amendment thereof, provide for any terms that are materially inconsistent with this Agreement, the Plan Term Sheet, or the Plan and are not otherwise reasonably satisfactory to the Bondholder Parties;

(vi)   the Company files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement, the Plan Term Sheet, or the Plan;

(vii)   the Bankruptcy Court grants relief that is materially inconsistent with this Agreement, the Plan Term Sheet or the Plan, or denies, after a final hearing, the Cash Collateral Motion or the Stay Relief Motion;

(viii)   an examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Case, the Chapter 11 Case shall have been converted to a case under chapter 7 of the Bankruptcy Code, or the Chapter 11 Case shall have been dismissed by order of the Bankruptcy Court, provided, however, that none of the Bondholder Parties has directly or indirectly sought, supported, or encouraged any such relief;

(ix)   the Company commences an action or proceeding (including, without limitation, any avoidance action), or otherwise supports any such action or proceeding by any other party to the Chapter 11 Case, challenging the rights or Claims of any of the Bondholder Parties to the extent such challenge seeks a treatment of such rights or Claims that is materially inconsistent with this Agreement, the Plan Term Sheet or the Plan;

(x)   the termination of, or occurrence of an event of default (as defined in the applicable order or agreement) by the Company under, any order or agreement respecting the Cash Collateral Motion which shall not have been cured within any applicable grace periods or waived;

(xi)   the Plan (and, if Section 4(g) hereof applies, the Permitted Cram-down) is not confirmed by the Bankruptcy Court by the Plan Confirmation Date or is not effective by the Plan Effective Date; or

(xii)   if Section 4(g) applies, the company fails to comply with its obligations under Section 4(g).

Unless the Termination Event is cured or waived by the Majority Bondholders in accordance with Section 11 hereof, this Agreement shall terminate on the seventh (7th) business day after the Company's receipt of the Termination Notice, subject to the Company's right to contest such Termination Event by timely filing a motion in the Bankruptcy Court.

(b)   Termination by Company. In the event that any Bondholder Party has breached in a material manner any of its obligations, representations, warranties, or covenants under this Agreement or the Term Sheet, and shall have failed to cure such breach, the Company may terminate this Agreement by submitting written notice of such breach to each of the Bondholder Parties. Unless the breach is cured or waived by the Company in accordance with Section 11 hereof, this Agreement shall terminate on the seventh (7th) business day after the

- 8 -

Bondholder Parties' receipt of such notice, subject to the Bondholder Parties' right to contest such breach and termination by timely filing a motion in the Bankruptcy Court

       (c)    <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Parties.

       (d)    <u>Effect of Termination</u>.  Upon the termination of this Agreement in accordance with this <u>Section 7</u> (other than under <u>Section 7(e)</u>), each Party shall, subject to <u>Section 15</u> hereof, be immediately released from its commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law.  Upon any such termination of this Agreement pursuant to either <u>Section 7(a) or 7(c)</u>, each Majority Holder may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Majority Holder prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement.

       (e)    <u>Automatic Termination</u>.  If not otherwise terminated as set forth herein, this Agreement (except as provided in <u>Section 15</u>) shall automatically terminate upon the Plan Effective Date.

      8.    **Good Faith Cooperation; Further Assurances; Acknowledgment**.  The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (a) all matters relating to this Agreement, (b) all matters concerning the implementation of the Plan Term Sheet and the Plan and (c) the pursuit and support of the Restructuring Transactions.  Subject to the terms hereof, each of the Parties shall take such actions as may be reasonably necessary to carry out the purposes and intent of this Agreement, including, as applicable, making and filing any required regulatory filings and voting any claims of the Company in favor of the Restructuring Transactions, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.  This Agreement is not, and shall not be deemed, a solicitation for consents to the Plan or a solicitation to tender or exchange of any of the Bonds.

      9.    **Definitive Documents**.  Each of the Parties hereby covenants and agrees (a) to negotiate in good faith the Definitive Documents (and in connection with the Amended and Restated Bond Documents, consistent with the Plan Term Sheet and the Plan) and (b) to execute (to the extent such Party is a party thereto) and otherwise support the Definitive Documents. For the avoidance of doubt, the Parties each agree to (x) act in good faith and use commercially reasonable efforts to permit the Company to complete the Solicitation in accordance with the terms of the Plan Term Sheet and this Agreement, and (y) do all things reasonably necessary and appropriate in furtherance of the Company's consummating the Plan in accordance with, and within the time frames contemplated by, this Agreement.  The Parties will undertake in good faith to obtain Bankruptcy Court approval of the release, injunction and exculpation provisions set forth in the Plan with respect to the Released Parties and the Trustee Released

Parties (each as defined under the Plan), provided, however, that the failure of the Bankruptcy Court to approve such provisions shall not provide a basis for any Party to terminate this Plan Support Agreement or otherwise relieve a Party from its obligations under this Plan Support Agreement or the Plan Term Sheet

10. **Representations and Warranties**. Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a)    it is validly existing and in good standing under the laws of the state of its organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership or other similar action on its part;

(b)    the execution, delivery, and performance by such Party of this Agreement does not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(c)    the execution, delivery, and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required for disclosure in connection with the Chapter 11 Case, the Plan, and the Disclosure Statement; and

(d)    this Agreement is a valid, legally binding obligation, and is enforceable in accordance with its terms.

11. **Amendments and Waivers**.    This Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented, and a Termination Event may not be waived, except in a writing signed by the all of the Parties.

12. **Effectiveness**. This Agreement shall not become effective and binding on the Parties unless and until counterpart signature pages to this Agreement shall have been executed by all of the Parties.

13. **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL**. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION, BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN

CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE CITY OF CHICAGO, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASE, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

14.    **Specific Performance**. It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled, in addition to any other remedy permitted by law, to specific performance and injunctive or other equitable relief as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

15.    **Survival**. Notwithstanding the termination of this Agreement pursuant to Section 7 hereof, the agreements and obligations of the Parties in this Section 15 and in Sections 7(d), 13, 14, 17, 19, 22, 23, 24 and 25 hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

16.    **Headings**. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

17.    **Successors and Assigns; Severability; Several Obligations**. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives, provided, however, that nothing contained in this Section 17 shall be deemed to permit sales, assignments or transfers of the Bonds or Claims other than in accordance with Section 2(d) of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof or the Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

DM_US 27229258-16.099749.0351

18.   **No Third-Party Beneficiaries**. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

19.   **Prior Negotiations; Entire Agreement; Amendment**.   This Agreement, including the exhibits and schedules hereto, including the Plan and Plan Term Sheet, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Bondholder Party shall continue in full force and effect subject to the terms and conditions thereof. This Agreement may be amended only in a writing and agreed to by the Parties.

20.   **Counterparts**. This Agreement may be executed in one or more counterparts (including by facsimile or electronic signature), each of which shall be deemed an original and all of which shall constitute one and the same agreement.

21.   **Notices**. All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, e-mail, courier or by registered or certified mail (return receipt requested) to the addresses and facsimile numbers set forth in **Exhibit G** (or at such other addresses or facsimile numbers as shall be specified by like notice), with a copy to each person identified thereon.

22.   **Reservation of Rights**.   Except as expressly provided otherwise in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Bondholder Parties to protect and preserve its rights, remedies and interests, including its claims against the Company.

23.   **Contests**. If any Party brings an action or proceeding against any other Party based upon a breach by such Party of its obligations under this Agreement, each Party will bear its own fees and expenses incurred, including attorneys', accountants' and financial advisors fees, in connection with such action or proceeding.

24.   **Relationship Among Parties**. It is understood and agreed that no Majority Bondholder has any duty of trust or confidence or fiduciary duty in any kind or form with any other Majority Bondholder or any other holder of the Bonds.

25.   **Foreclosure of Liens and Security Interests**. So long as the Agreement has not been duly and properly terminated pursuant to Section 7, none of the Bondholder Parties shall (a) take any actions to foreclose their liens and security interests in the Company's assets, (b) seek relief from the automatic stay in the Chapter 11 Case (except pursuant to the Stay Relief Motion), or (c) exercise any other remedies which are inconsistent with such Bondholder Party's agreements and obligations under this Agreement (including, without limitation, Section 2 hereof).

27.   **Construction**. Each of the Parties to this Agreement shall be deemed a drafter hereof.

DM_US 27229258-16.099749.0351

28.    <u>**Liability of the Bondholder Parties**</u>.  Notwithstanding anything to the contrary in this Agreement, in each instance where any liability or responsibility of the Bondholder Parties under this Agreement could result from action or inaction, such liability or responsibility shall be several and not joint.

29.    <u>**Exclusive Jurisdiction of the Bankruptcy Court**</u>.  The enforcement of this Agreement, and the adjudication of any disputes under this Agreement, shall be exclusively by the Bankruptcy Court, provided that the Bankruptcy Court elects to exercise such jurisdiction and adjudicate such dispute.  In the event that the Bankruptcy Court is deemed not have jurisdiction over a dispute arising under this Agreement, or abstains or otherwise elects not to exercise such jurisdiction, an action to enforce this Agreement may be brought in the courts of the State of Illinois or the courts of the United States of America for the Northern District of Illinois.  Each of the Parties hereby agrees to submit to the jurisdiction of each of the aforementioned courts for this purpose.

[The Remainder of This Page is Left Intentionally Blank]

- 13 -

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the day first written above.

**CHICAGOLAND CONSERVATIVE JEWISH HIGH SCHOOL FOUNDATION**

By: _L. Gerber_____

Name: Larry Gerber

Title: Treasurer

**ALLSTATE INSURANCE COMPANY**

By:_____

Name:

Title:

**INVESCO VAN KAMPEN HIGH YIELD MUNICIPAL FUND**

By:_____

Name:

Title:

**INVESCO VAN KAMPEN MUNICIPAL TRUST**

By:_____

Name:

Title:

**NUVEEN HIGH YIELD MUNICIPAL BOND FUND**

By:_____

Name:

Title:

**OPPENHEIMER ROCHESTER NATIONAL MUNICIPALS**

By:_____

Name:

Title:

[signatures continued on next page]

This is a signature page to the Plan Support Agreement

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the day first written above.

CHICAGOLAND CONSERVATIVE
JEWISH HIGH SCHOOL FOUNDATION

By:_____

Name:_____

Title:_____

TAILWIND ADVISORS LLC

By:_____

Name: MARK PAGE

Title: PRINCIPAL

INVESCO VAN KAMPEN HIGH YIELD
MUNICIPAL FUND

By:_____

Name:_____

Title:_____

INVESCO VAN KAMPEN MUNICIPAL
TRUST

By:_____

Name:_____

Title:_____

NUVEEN HIGH YIELD MUNICIPAL
BOND FUND

By:_____

Name:_____

Title:_____

OPPENHEIMER ROCHESTER
NATIONAL MUNICIPALS

By:_____

Name:_____

Title:_____

[signatures continued on next page]

This is a signature page to the Plan Support Agreement

DM_US 27229258-16.099749.0351

**IN  WITNESS  WHEREOF**, the undersigned have executed and delivered this Agreement as of the day first written above.

| | |
|---|---|
| **CHICAGOLAND CONSERVATIVE JEWISH HIGH SCHOOL FOUNDATION** | **TAILWIND ADVISORS LLC** |
| By:_____ | By:_____ |
| Name: | Name: |
| Title: | Title: |
| **INVESCO VAN KAMPEN HIGH YIELD MUNICIPAL FUND** | **INVESCO VAN KAMPEN MUNICIPAL TRUST** |
| By: *Elizabeth Nelson* | By: *Elizabeth Nelson* |
| Name:  Elizabeth Nelson | Name:  Elizabeth Nelson |
| Title:  Assistant Secretary | Title:  Assistant Secretary |
| **NUVEEN HIGH YIELD MUNICIPAL BOND FUND** | **OPPENHEIMER ROCHESTER NATIONAL MUNICIPALS** |
| By:_____ | By:_____ |
| Name: | Name: |
| Title: | Title: |

[signatures continued on next page]

This is a signature page to the Plan Support Agreement

DM_US 27229258-16.099749.0351

**IN WITNESS WHEREOF,** the undersigned have executed and delivered this Agreement as of the day first written above.

| | |
|---|---|
| **CHICAGOLAND CONSERVATIVE JEWISH HIGH SCHOOL FOUNDATION** | **TAILWIND ADVISORS LLC** |

By:_____     By:_____

Name:                                    Name:

Title:                                    Title:


**INVESCO VAN KAMPEN HIGH YIELD MUNICIPAL FUND**          **INVESCO VAN KAMPEN MUNICIPAL TRUST**

By:_____     By:_____

Name:                                    Name:

Title:                                    Title:


**NUVEEN HIGH YIELD MUNICIPAL BOND FUND**                 **OPPENHEIMER ROCHESTER NATIONAL MUNICIPALS**

By: *John V. Miller*                      By:_____

Name: JOHN MILLER                         Name:

Title: Co-Head of Fixed Income            Title:


[signatures continued on next page]


CJHS

This is a signature page to the Plan Support Agreement

DM_US 27229258-16.099749.0351

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the day first written above.

| | |
|---|---|
| CHICAGOLAND CONSERVATIVE JEWISH HIGH SCHOOL FOUNDATION | TAILWIND ADVISORS LLC |

By:_____     By:_____

Name:                             Name:

Title:                            Title:

| | |
|---|---|
| INVESCO VAN KAMPEN HIGH YIELD MUNICIPAL FUND | INVESCO VAN KAMPEN MUNICIPAL TRUST |

By:_____     By:_____

Name:                             Name:

Title:                            Title:

| | |
|---|---|
| NUVEEN HIGH YIELD MUNICIPAL BOND FUND | OPPENHEIMER ROCHESTER NATIONAL MUNICIPALS |

By:_____     By:_____

Name:                             Name:  Richard Stein

Title:                            Title:  Vice President

[signatures continued on next page]

This is a signature page to the Plan Support Agreement

DM_US 27229258-16.099749.0351

PACIFIC SPECIALTY INSURANCE
COMPANY

By:_____

Name:

Title:

STONEBRIDGE CAPITAL ADVISORS,
LLC

By: _____

Name: HEIDI L. HUKRIEDE

Title: Vice President
Director of Fixed Income

WELLS FARGO BANK, NATIONAL
ASSOCIATION, NOT INDIVIDUALLY
BUT AS SUCCESSOR INDENTURE
TRUSTEE

By:_____

Name:

Title:

CHICAGOLAND JEWISH HIGH SCHOOL
ENDOWMENT FUND

By:_____

Name:

Title:

PACIFIC SPECIALTY INSURANCE
COMPANY

By:_____

Name:

Title:

STONEBRIDGE CAPITAL ADVISORS,
LLC

By:_____

Name:

Title:

WELLS FARGO BANK, NATIONAL
ASSOCIATION, NOT INDIVIDUALLY
BUT AS SUCCESSOR INDENTURE
TRUSTEE

By: *Lucinda Hradela Claeys*

Name: *Lucinda Hradea - Claeys*

Title: *Vice President*

CHICAGOLAND JEWISH HIGH SCHOOL
ENDOWMENT FUND

By:_____

Name:

Title:

This is a signature page to the Plan Support Agreement

DM_US 27229258-16.099749 0351

PACIFIC SPECIALTY INSURANCE
COMPANY

STONEBRIDGE CAPITAL ADVISORS,
LLC

By:_____

By:_____

Name:

Name:

Title:

Title:

WELLS FARGO BANK, NATIONAL
ASSOCIATION, NOT INDIVIDUALLY
BUT AS SUCCESSOR INDENTURE
TRUSTEE

CHICAGOLAND JEWISH HIGH SCHOOL
ENDOWMENT FUND

By:_____

By:_____

Name:

Name: *Alan S. Frankel*

Title:

Title: *Authorized Signatory*

This is a signature page to the Plan Support Agreement

DM_US 27239258-16.099749.0351

*EXECUTION VERSION*

## PLAN VOTING AGREEMENT

This Plan Voting Agreement (the "Agreement"), dated as of April 29, 2011, is made and entered into by and among (i) Chicagoland Conservative Jewish High School Foundation (the "Company"), (ii) Chicagoland Jewish High School Endowment Fund (the "Endowment Fund"); (iii) and Allstate Insurance Company ("Allstate").   The Company, the Endowment Fund and Allstate shall be referred to, collectively, as the "Parties.")

## RECITALS

WHEREAS, pursuant to that certain Trust Indenture dated as of May 1, 2006 (the "Trust Indenture"), by and between the Village of Deerfield, Lake and Cook Counties, Illinois (the "Issuer") and the Indenture Trustee, the Issuer issued those certain Educational Facility Revenue Bonds (Chicagoland Conservative Jewish High School Project), Series 2006 in the aggregate principal amount of $27,515,000 (the "Bonds");

WHEREAS, as of the date of the Agreement, Allstate holds $3,000,000 in par amount of the Bonds;

WHEREAS, the proceeds of the Bonds were loaned to the Company, a not-for-profit corporation duly organized and validly existing under the laws of the State of Illinois, pursuant to a certain Loan Agreement dated as of May 1, 2006, by and between the Issuer and the Company (the "Loan Agreement"), to finance the acquisition of land and the construction and equipping of the Company's high school facility located at 1095 Lake Cook Road in Deerfield, Illinois (the "Project"). The loan is evidenced by a certain Promissory Note dated as of May 1, 2006 (the "Note") made by the Debtor in favor of the Issuer, and assigned by the Issuer to the Indenture Trustee;

WHEREAS, as security for the Note and the Bonds, the Company granted to the Indenture Trustee, for the benefit of the Bondholders, a mortgage on the Project and a security interest in fixtures, equipment and all other personal property at the Project, as evidenced by a certain Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated as of May 1, 2006, by and between the Company and MB Financial Bank, NA, as trustee under Land Trust No. 3366 (the "Mortgage");

WHEREAS, Allstate acknowledges that the Company and the Bondholder Parties (as defined in that certain Plan Support Agreement of even date hereof (the "PSA")) have agreed to implement a restructuring of the Bonds and a reorganization of the Company pursuant to the terms and conditions set forth in the restructuring term sheet attached hereto as **Exhibit A** (including the schedules and exhibits attached thereto, the "Plan Term Sheet"). The Plan Term Sheet is the product of arm's length, good faith negotiations between the Company, the Indenture Trustee, the Endowment Fund and the Bondholder Parties;

WHEREAS, Allstate acknowledges that the restructuring transactions contemplated by the Plan Term Sheet (the "Restructuring Transactions") will be implemented through a plan of reorganization under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), which plan shall be consistent in all material respects with the terms of the Plan Term Sheet and shall be substantially in the form of **Exhibit B** hereto (the "Plan"); and

**WHEREAS,** Allstate acknowledges that the Company has agreed to commence a voluntary reorganization case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court") to implement the Plan and effect the Restructuring Transactions; and

**WHEREAS,** Allstate has agreed to vote its Claims (as defined below) in favor of the confirmation of the Plan, provided that there are no subsequent modifications or supplements to the Plan which, in Allstate's determination, impose potential liability or additional obligations upon Allstate.

## AGREEMENT

**NOW THEREFORE,** in consideration of the mutual promises and covenants set forth herein, and for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties covenant and agree as follows:

1.      **Additional Definitions.**   Capitalized terms used in this Agreement and not defined in this Agreement (including the Recitals) shall have the meanings given to those terms in the Plan Term sheet. Additionally, the following terms have the following meanings:

(a)      "Lock-Up Effective Date" means the date upon which this Agreement becomes effective and binding on the Parties in accordance with the provisions of Section 12 hereof.

(b)      "Lock-Up Period" means the period commencing on the Lock-Up Effective Date and ending on the date on which this Agreement is terminated in accordance with Section 7 hereof, which date shall not in any event be later than October 1, 2011.

2.      **Agreements of Allstate.**

(a)      Allstate represents and warrants that, as of the date hereof, (1) Allstate is the beneficial owner of the aggregate principal amount of Bonds set forth in the Recital above and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such Bonds (the "Claims"), and (2) Allstate has full power and authority to vote on and consent to all matters concerning such Bonds and the Claims and to exchange, assign and transfer such Bonds and Claims.

(b)      Allstate agrees that, unless and until this Agreement has been duly and properly terminated in accordance with Section 7 hereof, it, so long as it is afforded the same rights and releases as a Trustee Released Party (as defined in the Plan):

(1)      shall timely vote or cause to be voted its Bonds and Claims to accept the Plan (including any modifications or supplements to the Plan as presented for confirmation which, in Allstate's determination, do not impose any potential liability or additional obligation upon Allstate), provided, however, that such vote may, upon prior written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by Allstate at any time following the expiration of the Lock-Up Period;

-2-

(2)     shall timely vote or cause to be voted against, and not consent to, or otherwise directly or indirectly support, solicit, assist, encourage or participate in the formulation of, any plan, proposal, or offer of restructuring, reorganization, dissolution, winding up, liquidation, or merger of the Company other than the Plan Term Sheet and the Plan; and

(3)     if <u>Section 4(g)</u> of the PSA applies and the Company complies with its obligations under <u>Section 4(g)</u>, shall not oppose the Permitted Cram-Down (as defined in <u>Section 4(g)</u> hereof).

(c)     Allstate agrees that until this Agreement has been duly and properly terminated in accordance with <u>Section 7</u> hereof, it shall not (1) directly or indirectly seek, solicit, support or encourage the termination or modification of the exclusive period for the filing of any plan, proposal or offer of restructuring, reorganization, dissolution, winding up, liquidation, or merger of the Company, or take any other action (including, without limitation, commencing any legal proceedings or enforcing rights, liens, or security interests) that could materially prevent, interfere with, delay or impede the approval or confirmation of the Plan (the "<u>Solicitation</u>") or the implementation or consummation of the Restructuring Transactions as contemplated by the Plan Term Sheet and the Plan, or (2) take any other action that is inconsistent with, or that would materially delay confirmation or consummation of the Plan Term Sheet, the Plan, or the Restructuring Transactions, <u>provided</u>, <u>however</u>, that nothing contained herein shall limit the rights of Allstate from appearing and participating in the Chapter 11 Case as a party-in-interest concerning any matter arising in the Chapter 11 Case so long as the exercise of such rights is not inconsistent with Allstate's obligations hereunder and the terms of the Plan Term Sheet and the Plan or defend any action naming Allstate in any event.

(d)     Allstate agrees that, for the duration of the Lock-Up Period, Allstate shall not sell, transfer, loan, hypothecate, assign, or otherwise dispose of (including by participation), in whole or in part, any of the Bonds or any option thereon or any right or interest therein (including the deposit of any Bonds into a voting trust or entry into a voting agreement with respect to any such Bonds other than this Agreement), unless the transferee thereof either (1) is a Majority Bondholder (as defined in the PSA) or (2) prior to such transfer, agrees in writing for the benefit of the Parties to be bound by all of the terms of this Agreement applicable to Allstate by executing the Joinder Agreement attached hereto as **Exhibit C** (the "<u>Joinder Agreement</u>") and delivering an executed copy thereof to the Company's counsel, in which event the transferee shall be deemed to be a Party hereunder to the extent of such transferred rights and obligations. Allstate agrees that any sale, transfer or assignment of any Bonds that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Party shall have the right to enforce the voiding of such transfer.

(e)     To the extent Allstate (1) acquires additional Bonds or (2) holds or acquires any other claims, rights or interests against the Company entitled to vote on the Plan, then, in each case, Allstate agrees that such claims, rights or interests shall be subject to this Agreement (including, without limitation, <u>Section 2(c)</u> hereof) and that, for the duration of the Lock-Up Period, it shall vote (or cause to be voted) any such claims, rights or interests in a manner consistent with <u>Section 2(b)</u> hereof. Allstate agrees that, for the duration of the Lock-Up

-3-

Period, it shall vote any and all of its other claims, rights or interests in the Company in a manner consistent with <u>Section 2(b)</u> hereof, and shall not transfer any such claims.

3.    **[RESERVED]**

4.    **[RESERVED]**

5.    **[RESERVED]**

6.    <u>**Agreements Regarding Bondholder Party Fees and Expenses**</u>.

(a)    Allstate agrees that any legal expenses it incurs in connection with this Agreement or the confirmation of the Plan shall be borne by Allstate; provided, however, that if Allstate has not breached in a material manner any of its obligations, representations, warranties, or covenants under the this Agreement, Allstate reserves the right to seek reimbursement of any of its professional fees from the Estate (i) with the written consent of the Company, (ii) if the Plan is not confirmed as provided in the Term Sheet, or (iii) if this Agreement has been duly and properly terminated in accordance with Section 7(a) hereof.

(b)    Provided that the Plan is consummated in accordance with this Agreement and the Plan Term Sheet, Allstate agrees to waive, as of the Plan Effective Date, any and all obligations of the Company under any existing agreements of the Company regarding the payment of the fees and expenses of Allstate and the Indenture Trustee and its and their advisors incurred prior to the Filing Date.

7.    <u>**Termination of Agreement**</u>.

(a)    <u>Termination by Allstate</u>.    If any of the following events (each, a "<u>Termination Event</u>") occurs, is continuing, and is not waived in accordance with Section 11 hereof, Allstate may submit notice of such Termination Event and its intention to terminate this Agreement ("<u>Termination Notice</u>") to the Company and counsel for the Company:

(i)    the Company files, propounds or otherwise supports any plan of reorganization or restructuring other than the Plan and in accordance with the Plan Term Sheet;

(ii)    the Plan (including all Amended and Restated Bond Documents) is not filed or is modified or replaced such that it (or any such replacement) at any time is not in whole or in part consistent in any material respect with the Plan Term Sheet or, in Allstate's determination, imposes any potential liability or additional obligation upon Allstate;

(iii)    the Company withdraws or revokes the Plan Term Sheet or the Plan;

(iv)    the Company shall have breached in a material manner any of its obligations, representations, warranties, or covenants under this Agreement, and shall have failed to cure such breach within a reasonable period of time, <u>provided</u>, <u>however</u>, that no such cure period shall extend in any event beyond the expiry date of October 1, 2011 of this Agreement;

-4-

(v)   any final Amended and Restated Bond Documents, provide for any terms that, in Allstate's determination, imposes any liability, contingent liability or obligation upon Allstate;

(vi)   the Company files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement, the Plan Term Sheet, or the Plan;

(vii)   the Bankruptcy Court grants relief that is materially inconsistent with this Agreement;

(viii)   an examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Case, the Chapter 11 Case shall have been converted to a case under chapter 7 of the Bankruptcy Code, or the Chapter 11 Case shall have been dismissed by order of the Bankruptcy Court, provided, however, that Allstate has not directly or indirectly sought, supported, or encouraged any such relief;

(ix)   the Company commences an action or proceeding (including, without limitation, any avoidance action), or otherwise supports any such action or proceeding by any other party to the Chapter 11 Case, challenging the rights or Claims of Allstate to the extent such challenge seeks a treatment of such rights or Claims that is inconsistent with this Agreement and the Plan;

(x)   the termination of, or occurrence of an event of default (as defined in the applicable order or agreement) by the Company under, any order or agreement respecting the Cash Collateral Motion which shall not have been cured within any applicable grace periods or waived;

(xi)   the Plan (or, if Section 4(g) hereof applies, the Permitted Cram-down Plan) is not confirmed by the Bankruptcy Court by the Plan Confirmation Date or is not effective by the Plan Effective Date; or

(xii)   if Section 4(g) applies, the company fails to comply with its obligations under Section 4(g).

Unless the Termination Event is cured or waived by Allstate in accordance with Section 11 hereof, this Agreement shall terminate on the seventh (7th) business day after the Company's receipt of the Termination Notice, which termination shall be effective without prejudice to the Company's right to contest such Termination Event by timely filing a motion in the Bankruptcy Court.

(b)   Termination by the Company. In the event that Allstate has breached in a material manner any of its obligations, representations, warranties, or covenants under this Agreement, and shall have failed to cure such breach within a reasonable period of time, the Company may terminate this Agreement by submitting written notice of such breach to Allstate. Unless the breach is cured or waived by the Company in accordance with Section 11 hereof, this Agreement shall terminate on the seventh (7th) business day after the Bondholder Parties' receipt

of such notice, which termination shall be effective without prejudice to Allstate's right to contest such breach and termination by timely filing a motion in the Bankruptcy Court

(c)      Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Parties.

(d)      Effect of Termination.  Upon the termination of this Agreement in accordance with this Section 7 (other than under Section 7(e)), each Party shall, subject to Section 15 hereof, be immediately released from its commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law.  Upon any such termination of this Agreement pursuant to either Section 7(a) or 7(c) or 7(e), Allstate may, upon written notice to CJHS and the other Parties, revoke its vote or any consents given by Allstate prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement.

(e)      Automatic Termination.  If not otherwise terminated as set forth herein, this Agreement (except as provided in Section 15) shall automatically terminate upon the first to occur of the Plan Effective Date or October 1, 2011.

8.      **[RESERVED]**

9.      **[RESERVED]**

10.      **Representations and Warranties**.  Allstate represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a)      it is validly existing and in good standing under the laws of the state of its organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership or other similar action on its part;

(b)      the execution, delivery, and performance by such Party of this Agreement does not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(c)      the execution, delivery, and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body,

-6-

except such filings as may be necessary and/or required for disclosure in connection with the Chapter 11 Case, the Plan, and the Disclosure Statement; and

(d)     this Agreement is a valid, legally binding obligation, and is enforceable in accordance with its terms.

11.     **Amendments and Waivers**.   This Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented, and a Termination Event may not be waived, except in a writing signed by the all of the Parties.

12.     **Effectiveness**.  This Agreement shall not become effective and binding on the Parties unless and until counterpart signature pages to this Agreement shall have been executed by all of the Parties.

13.     **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL**.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION, BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE CITY OF CHICAGO, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASE, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

14.     **Specific Performance**.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled, in addition to any other remedy permitted by law, to specific performance and injunctive or other equitable relief as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

15.   **Survival**. Notwithstanding the termination of this Agreement pursuant to <u>Section 7</u> hereof, the agreements and obligations of the Parties in this <u>Section 15</u> and in <u>Sections 7(d)</u>, <u>13</u>, <u>14</u>, <u>17</u>, <u>19</u>, <u>22</u>, <u>23</u>, <u>24</u> and <u>25</u> hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

16.   **Headings**. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

17.   **Successors and Assigns; Severability; Several Obligations**. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives, provided, however, that nothing contained in this <u>Section 17</u> shall be deemed to permit sales, assignments or transfers of the Bonds or Claims other than in accordance with <u>Section 2(d)</u> of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof or the Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

18.   **No Third-Party Beneficiaries**. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

19.   **Prior Negotiations; Entire Agreement; Amendment**. This Agreement, including the exhibits and schedules hereto, including the Plan and Plan Term Sheet, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof. This Agreement may be amended only in a writing and agreed to by the Parties. In the event of a conflict between this Agreement and any exhibit or schedule hereto, the terms of this Agreement shall prevail.

20.   **Counterparts**. This Agreement may be executed in one or more counterparts (including by facsimile or electronic signature), each of which shall be deemed an original and all of which shall constitute one and the same agreement.

21.   **Notices**. All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, e-mail, courier or by registered or certified mail (return receipt requested) to the addresses and facsimile numbers set forth in **Exhibit D** (or at such other addresses or facsimile numbers as shall be specified by like notice), with a copy to each person identified thereon.

22.   **Reservation of Rights**. Except as expressly provided otherwise in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict

the ability of Allstate to protect and preserve its rights, remedies and interests, including its claims against the Company.

23.    **Contests**.  If any Party brings an action or proceeding against any other Party based upon a breach by such Party of its obligations under this Agreement, each Party will bear its own fees and expenses incurred, including attorneys', accountants' and financial advisors fees, in connection with such action or proceeding.

24.    **Relationship Among Parties**.  It is understood and agreed that no Majority Bondholder or Allstate has any duty of trust or confidence or fiduciary duty in any kind or form with any other Majority Bondholder or any other holder of the Bonds.

25.    **Foreclosure of Liens and Security Interests**.  So long as the Agreement has not been duly and properly terminated pursuant to Section 7, Allstate will not direct the Indenture Trustee to (a) take any actions to foreclose its liens and security interests in CJHS's assets, (b) seek relief from the automatic stay in the Chapter 11 Case (except pursuant to the Stay Relief Motion), or (c) exercise any other remedies which are inconsistent with Allstate's agreements and obligations under this Agreement (including, without limitation, Section 2 hereof).

27.    **Construction**.  Each of the Parties to this Agreement shall be deemed a drafter hereof.

28.    **No Obligations.**  The Company and the Endowment Fund each acknowledge and agree that, except for its undertakings in this Agreement, Allstate has no obligation or liability to the Company or the Endowment Fund.

29.    **Exclusive Jurisdiction of the Bankruptcy Court**.  The enforcement of this Agreement, and the adjudication of any disputes under this Agreement, shall be exclusively by the Bankruptcy Court, provided that the Bankruptcy Court elects to exercise such jurisdiction and adjudicate such dispute.  In the event that the Bankruptcy Court is deemed not have jurisdiction over a dispute arising under this Agreement, or abstains or otherwise elects not to exercise such jurisdiction, an action to enforce this Agreement may be brought in the courts of the State of Illinois or the courts of the United States of America for the Northern District of Illinois.  Each of the Parties hereby agrees to submit to the jurisdiction of each of the aforementioned courts for this purpose.


[The Remainder of This Page is Left Intentionally Blank]

-9-

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the day first written above.

**CHICAGOLAND CONSERVATIVE
JEWISH HIGH SCHOOL FOUNDATION**

By: _L. Gerber_ _____

Name:  Larry Gerber

Title:  Treasurer

**ALLSTATE INSURANCE COMPANY**

By: _____

Name:

Title:

**CHICAGOLAND JEWISH HIGH
SCHOOL ENDOWMENT FUND**

By: _____

Name:

Title:

This is a signature page to the Plan Voting Agreement

~~SH Comments 4-29-11 to MW&E DRAFT 04/26/11~~ 
EXECUTION

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the day first written above.

**CHICAGOLAND CONSERVATIVE JEWISH HIGH SCHOOL FOUNDATION**

By:_____

Name:

Title:

**ALLSTATE INSURANCE COMPANY**

By: _____

Name:  Jerry D. Zinkula   Mark Cloghessy

Title:  Authorized Signatories

**CHICAGOLAND JEWISH HIGH SCHOOL ENDOWMENT FUND**

By:_____

Name:

Title:

[signatures continued on next page]

This is a signature page to the Plan Support Agreement

*EXECUTION VERSION*

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the day first written above.

CHICAGOLAND CONSERVATIVE                    ALLSTATE INSURANCE COMPANY
JEWISH HIGH SCHOOL FOUNDATION

By:_____                By:_____

Name:                                       Name:

Title:                                      Title:

CHICAGOLAND JEWISH HIGH
SCHOOL ENDOWMENT FUND

By _____

Name: *Alan S. Frankel*

Title: *Authorized Signatory*

[signatures continued on next page]

This is a signature page to the Plan Support Agreement